A.L. WILLIAMS & ASSOCIATES, INC.; Massachusetts Indemnity and Life Insurance Company; First American National Securities, Inc., Satellite Conference Network, Inc.; Arthur L. Williams, Jr.; Rob Victor; and Rusty Crossland, Petitioners,

v.

Todd W. McMAHON and Nancy McMahon, Respondents.

Civ. A. No. 1:88–cv–669–RLV.

United States District Court, N.D. Georgia, Atlanta Division.

Sept. 6, 1988.

Sidney O. Smith, Jr. and Anne S. Rampacek, Alston & Bird, Atlanta, Ga., for petitioners.

Terrence B. Adamson and Anthony E. DiResta, Dow, Lohnes & Albertson, Atlanta, Ga., for respondents.

## ORDER

VINING, District Judge.

This is an action to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 4, and to stay a state court proceeding brought by the respondents against the petitioners in California.

On March 30, 1988, this court granted the petitioners' ex parte motion to stay the California action. Since the parties sought oral argument on both the merits of the petition to compel arbitration and upon the authority of this court to stay the state court proceedings, the parties agreed for this court's stay to remain in effect pending full briefing and oral arguments on the issues raised in the petition. On July 11, 1988, the court heard oral argument with respect to this court's authority to issue a stay order and requested additional brief-

ing.[1] The issues before the court are now ripe for decision.

## I. FACTUAL BACKGROUND

Massachusetts Indemnity and Life Insurance Company ("MILICO") is a life insurance company incorporated in Massachusetts with its principal place of business in Duluth, Georgia. Arthur L. Williams, Jr. ("Williams") and A.L. Williams & Associates, Inc. ("Williams, Inc.") are, collectively, a general agent of MILICO.

MILICO insurance policies are sold by independent contractor life insurance agents who are recruited, trained, and organized under guidelines established by Williams, Inc. These insurance agents make up the A.L. Williams sales force and are licensed to use Williams, Inc.'s federally registered trademark. A person who is recruited and accepted by Williams, Inc. enters into an independent contractor agreement with Williams, Inc. and, when he or she obtains a license to sell insurance, enters into a life insurance agent agreement with MILICO and sells exclusively life insurance products of MILICO.

First American National Securities, Inc. ("FANS") is a Georgia corporation, which markets mutual funds. Mutual funds approved by FANS are sold exclusively by qualified members of the A.L. Williams sales force.

Satellite Conference Network, Inc., is an Illinois corporation with its principal place of business in New York. It has sold equipment used for communication within the A.L. Williams sales force.

Williams is president of Williams, Inc. Rob Victor is a life insurance agent with MILICO and at all times material hereto was downline to Todd W. McMahon within

1. At that hearing the court noted that the respondents had questioned the court's diversity jurisdiction. In their pleadings the respondents had contended that the principal place of business of Massachusetts Indemnity and Life Insurance Company was, at the time of the filing of this action, in California, not in Georgia. Since the respondents are California citizens, these allegations, if true, would defeat the court's diversity jurisdiction. At the July 11 hearing, the court granted the parties additional time in which to conduct discovery with respect to this issue. The respondents have notified the court that their additional discovery has not turned up sufficient facts to support their allegation that MILICO's move of its principal place of business from California to Georgia had not been effected at the time this suit was filed. This court has reviewed the documents before it and concludes as a matter of fact that MILICO's principal place of business was in Georgia when this suit was filed.

the A.L. Williams sales force. Rusty Crossland is a life insurance agent with MILICO and at all times material hereto was a national sales director within the A.L. Williams sales force. At all times material hereto, Todd W. McMahon was a life insurance agent with MILICO, a registered representative of FANS, and, successively, regional vice president, senior vice president, and national sales director within the A.L. Williams sales force. Nancy McMahon is Todd McMahon's wife and, purportedly, his business partner.

Agents of the A.L. Williams sales force market financial products throughout the United States. The activities of the agents in selling MILICO insurance policies and/or mutual funds approved by FANS are monitored by Williams, Inc. and FANS. Agents' activities are reviewed for compliance with applicable governmental and other regulations, for compliance with the terms of the various independent contractor agreements with for compliance with the agents, and for compliance with guidelines for professional conduct issued by Williams, Inc. and FANS. This monitoring is conducted primarily through "upline agents" in the sales hierarchy.

Upline agents are individuals who support and oversee lower level agents in the A.L. Williams sales force hierarchy. These upline agents have titles of, in ascending order, regional vice president ("RVP"), senior vice president ("SVP"), national sales director ("NSD"), and senior national sales director ("SNSD"). These upline agents receive "override commissions," *i.e.*, percentages of the commissions paid by MILICO on policies sold by lower level sales persons. Individuals who hold such lower level positions in the hierarchy are referred to as "downline agents."

RVP's, SVP's, and NSD's enter into additional independent contract agreements with Williams, Inc.; there is a separate independent contractor agreement for each of these positions, and each agreement incorporates the terms of other agreements signed by the upline agent to the extent that those terms are not specifically altered in his or her new agreement.

Members of the A.L. Williams sales force who obtain licenses to sell securities enter into registered representative agreements with FANS.

The RVP agreement executed by Todd McMahon contains the following language with respect to arbitration:

> The Parties agree that, except as specifically provided to the contrary in this Agreement, any controversy, claim, dispute or other matter in question (whether the Parties' rights and remedies are governed or created by the law of contract, tort or otherwise, or by federal, state or local statute, legislation, rule of regulations), arising out of or relating to this Agreement (and/or any agreement superseded by this Agreement), or the breach thereof, between or among the RVP, on the one part, and Williams, Inc., and/or any of the officers, directors and employees of Williams, Inc., whether present or past, and whether in their individual or their corporate capacities, or any of them, on the other part, (hereinafter referred to as a "Dispute") shall be resolved exclusively by Negotiation and Arbitration in accordance with this section 15.

The MILICO and FANS agreements contain substantially the same language.[2]

Todd McMahon became a member of the A.L. Williams sales force in 1980, and in March 1981, he became regional vice-president. He became a senior vice president in November 1983 and a national sales director in June 1985.

Mr. McMahon signed his most recent A.L. Williams RVP agreement in Novem-

---

**2.** The FANS agreement is slightly different from the other two agreements and provides that disputes "shall be resolved exclusively as follows: (a) where required, by arbitration under the rules of one of the following organizations: the NASD, the New York Stock Exchange, Incorporated, the American Stock Exchange, or any exchange located in the United States upon which listed options, transactions are executed; or (b) if required by none of the foregoing, then by Negotiation and Arbitration in according with this Article 9." This modification is irrelevant for purposes of this litigation.

ber 1986, signed his most recent SVP agreement in September 1985, and signed his most recent NSD agreement in November 1987. In August 1986, he executed a new FANS agreement and in November 1986 executed a new MILICO agreement.

In late 1987 various allegations of unlawful conduct by Mr. McMahon came to the attention of Judy C. Cohn, vice president of and counsel to Williams, Inc. Among other things, Ms. Cohn was advised that Mr. McMahon had defrauded downline agents by selling them percentages of his royalty interest in an Arizona gold mining venture for a price which exceeded his costs and had made material misrepresentations in order to induce these sales. Mr. McMahon also reportedly pressured downline agents to purchase stock under an agreement providing that he would share in the profits and cover any losses; however, when the stock price dropped, he refused to cover the losses as promised. She further learned of allegations that Mr. McMahon had blocked the promotion of some agents and coerced others to give up their RVP status so that he would be able to obtain larger shares of certain bonus pools. She was also informed of allegations that Mr. McMahon had failed to perform his oversight and assistance responsibilities with regard to his downline agents.

Subsequently, on or about November 23, 1987, Mr. McMahon's NSD agreement was terminated. On December 21, 1987, Williams, Inc., notified Mr. McMahon that it was terminating his RVP and SVP agreements and further notified him that it was asking MILICO to terminate his agency agreement. Mr. McMahon's FANS agreement was terminated on December 23, 1987.

On or about November 24, 1987, Arthur L. Williams, Jr., in a closed circuit television broadcast to thousands of sales agents and other employees throughout the United States, commented on the allegations made against Mr. McMahon and stated, inter alia, that Mr. McMahon had been engaged in illegal conduct.

On February 9, 1988, the McMahons filed a complaint against the petitioners in the Superior Court of California in and for the city and county of San Francisco, in which they asserted claims for libel, interference with prospective business advantage, fraud, conspiracy to defraud, conversion, intentional infliction of emotional distress, and negligent infliction of emotional distress; the complaint also sought injunctive relief and an accounting. The petitioners then brought this suit to compel the respondents to arbitrate those claims raised in the California suit.

## II. LEGAL DISCUSSION

Since the California action was filed approximately six weeks prior to the filing of this action, this court must decide, as an initial matter, whether principles of comity, federalism, and judicial economy require (or permit) this court to defer to the California court and let it decide all issues, including the issue of whether the McMahons' claims are subject to arbitration.

"Abstention from the exercise of federal jurisdiction is the exception, not the rule." *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483. The doctrine of abstention is a narrow exception to the duty of a district court to adjudicate a controversy properly before it, and traditionally was exercised only in three circumstances: (1) when a federal constitutional issue might be mooted or presented in a different posture by a state court determination of pertinent state law, *Railroad Commission of Texas v. Pullman Company,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); (2) when there have been presented difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar, *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); (3) when, absent bad faith, harassment, or a patently invalid state statute, federal jurisdiction has been invoked for the purpose of restraining state criminal proceedings, *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). The case at bar does

not fall within any of these three categories of the abstention doctrine.

However, in *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), the Supreme Court held that a district court could properly defer to a state court and dismiss a federal suit not only under the three categories of abstention but also on "considerations of '[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'" 424 U.S. at 817, 96 S.Ct. at 1246, quoting *Kerotest Manufacturing Co. v. C–O–Two Fire Equipment Co.*, 342 U.S. 180, 183, 72 S.Ct. 219, 221, 96 L.Ed. 200 (1952). However, the Supreme Court also noted that the pendency of an action in state court was no bar to proceedings concerning the same matter in a federal court having jurisdiction and further noted that the federal courts have a "virtually unflagging obligation ... to exercise the jurisdiction given them." 424 U.S. at 817, 96 S.Ct. at 1246.

The Court set forth various factors that a federal court should consider in assessing the appropriateness of a dismissal in the event of an exercise of concurrent jurisdiction. Such factors include whether a court has assumed jurisdiction over a res, the inconvenience of the federal forum, the desirability of avoiding piecemeal litigation, and the order in which jurisdiction was obtained by the concurrent forums. The Supreme Court went on to state, however, "Only the clearest of justifications will warrant dismissal" by the federal court. 424 U.S. at 819, 96 S.Ct. at 1247. Indeed, the Eleventh Circuit, itself, has held that in the absence of compelling circumstances, the court initially seized of a controversy should be the one to decide the case and that a federal court should tread lightly when a state proceeding is already under way. *Merrill Lynch, Pierce, Fenner & Smith v. Haydu*, 675 F.2d 1169 (11th Cir. 1982).

In *Moses H. Cone Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 16, 103 S.Ct. 927, 937, 74 L.Ed.2d 765 (1983), the Supreme Court characterized the test enunciated in *Colorado River* as the "exceptional-circumstances test" and stated, "[T]he decision whether to dismiss a federal action because of parallel state-court litigation does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction." Additionally, in *Moses H. Cone* the Supreme Court discussed an additional factor which must be considered in addition to those factors expressly discussed in *Colorado River*—"the fact that federal law provides the rule of decision on the merits."

In *Moses H. Cone*, a case wherein the district court stayed its action pending a resolution of the state court action since both actions involve the arbitrability of the plaintiff's claims, the Supreme Court stated:

> [W]e emphasize that our task in cases such as this is not to find some substantial reason for the *exercise* of federal jurisdiction of the district court; rather, the task is to ascertain whether there exist "exceptional" circumstances, the "clearest of justifications," that can suffice under *Colorado River* to justify the *surrender* of that jurisdiction. Although in some rare circumstances the presence of state-law issues may weigh in favor of that surrender, ... the presence of federal-law issues must always be a major consideration weighing against surrender.

460 U.S. at 25–26, 103 S.Ct. at 941–942 (footnote omitted).

The Court observed that while the enforcement of the federal arbitration act "is left in large part to the state courts, it nevertheless represents federal policy to be vindicated by the federal courts where otherwise appropriate." 460 U.S. at 25 fn. 32, 103 S.Ct. at 941–942 fn. 32.

■ It is clear from *Moses H. Cone* that although a federal district court has the ability to defer to a state court when there is concurrent jurisdiction and parallel state court litigation, such power may be exercised only in very limited circumstances and would almost never be exercisable in

the context of proceedings to compel arbitration.

Applying the *Colorado River/Moses H. Cone* factors to this case, this court finds that there has been no showing of the requisite exceptional circumstances to justify this court's abstaining from exercising jurisdiction. The first factor may be disregarded since there was no assumption by either court of jurisdiction over any res or property. Since the question of arbitrability is a legal issue, which has already been fully briefed by all parties, the court finds that there is no inconvenience suffered by the McMahons by having that issue litigated in this federal forum instead of the California state court forum. Having this federal court decide the issues presented will not result in piecemeal litigation, since this court's decision will resolve all of the issues presented. The fact that the state court action was filed first does weigh in the McMahons' favor. However, that action was instituted less than two months prior to the filing of this action, and this court finds that the petitioners acted promptly in filing their federal action. Furthermore, the Supreme Court noted in *Moses H. Cone* that "priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions." 460 U.S. at 21, 103 S.Ct. at 939–940. This court notes that the California action had not progressed beyond the filing of initial discovery requests by the plaintiffs in that action before the federal action was filed. The fifth factor, the fact that federal law provides the rule of decision on the merits, weighs very heavily against this court's relinquishing jurisdiction. This factor played a major role in the court's decision in *Moses H. Cone,* and this court finds that, when all the factors are considered together, the McMahons have not shown why this court should relinquish jurisdiction.

The court must now determine whether the claims asserted by the McMahons in their California action are subject to the arbitration requirements contained in the agreements executed by Mr. McMahon.

Although the McMahons in their California action couched their claims in terms of libel and other state law claims, it is clear from a reading of that complaint that all of the claims either arise out of or relate to the agreements executed by Mr. McMahon. The allegedly libelous statements made by Mr. Williams referred, in part, to Mr. McMahon's conduct as an agent for Williams, Inc., and, undoubtedly, would never have been uttered had Mr. McMahon not been an agent of Williams, Inc. The McMahons point out that the allegedly libelous statements refer to incidents that occurred in 1983 and 1984, before the 1986 RVP agreement came into existence. They contend that events that allegedly occurred in 1983 and 1984 cannot arise out of or relate to the 1986 agreement. This argument is without merit since it would be the allegedly libelous statements that would be the subject of the arbitration, not the subject matter to which the libel relates, and the allegedly libelous statements were made in 1987, after the signing of the 1986 RVP agreement. The other state law claims for fraud, infliction of emotional distress, interference with prospective business advantage, all, in some way, relate to Mr. McMahon's employment by Williams, Inc., MILICO, or FANS, and, therefore, are subject to arbitration.

The McMahons also argue that since Nancy McMahon was not a signatory to the agreements and since some of the petitioners in this action were not signatories to the agreements, arbitration cannot be compelled with respect to Ms. McMahon's claims or with respect to Mr. McMahon's claims against those persons who did not sign the agreement. This court understands that arbitration clauses are part of contractual agreements and that, as a general proposition, persons who are not parties to a contract are not bound by the provisions of that contract. However, scrutiny of the instant case shows how these general propositions of law are inapplicable to the case at bar.

The McMahons claim that non-signatory petitioners are liable to them for alleged

failure to perform contractual duties. Furthermore, Mrs. McMahon alleges no entitlement to damages distinct from those allegedly suffered by her husband and bases her entitlement to allegations that she was her husband's business partner and that she "has a vested interest in all commissions and other income earned by Todd through his employment by and affiliation with defendants." California Complaint at paragraph 10. Although not binding on this court, the reasoning in *Hughes Masonry Co. v. Greater Clarke County School Building Corp.*, 659 F.2d 836 (7th Cir. 1981), is persuasive. There, the Court of Appeals reversed the district court's order which had denied arbitration and held that the non-signatory was estopped from arguing that it should not be compelled to arbitrate by a party who was not a signatory to the arbitration agreement. The Court held that since Hughes Masonry was suing that party for breach of the contract which contained the arbitration agreement, it would be "manifestly inequitable" to permit Hughes Masonry to argue that the non-signatory was liable for its failure to perform the contractual duties described in the agreement and at the same time argue that the non-signatory could not invoke the arbitration clause. This court believes, as did the Seventh Circuit, that a party cannot have it both ways; it cannot rely on the contract when it works to its advantage and then repute it when it works to its disadvantage. Therefore, in this case the court will not allow Mrs. McMahon to assert claims allegedly arising out of the agreements executed by her husband without requiring her also to abide by the arbitration clauses in those agreements. Furthermore, this court believes that it would be manifestly unfair to allow Mr. McMahon to assert claims arising out of the agreements against non-signatories to those agreements without allowing those people also to invoke the arbitration clauses contained in the agreements.

■ The McMahons also argue that the arbitration agreement should not be enforced because they are unconscionable. They argue that the arbitration clauses may be read to require that arbitration be conducted in Georgia as opposed to their home state of California and that the judicial review of any arbitration award does not appear to be strictly limited in scope. Even assuming that the McMahons' characterization of a court's review of any arbitration award is correct, this court does not believe that this provision or the provision which might require arbitration in Georgia is "inherently unfair or oppressive." The McMahons have cited no cases characterizing such provisions as unconscionable, and this court has found none. The court finds that the McMahons have not met their burden of showing that the arbitration clauses are unconscionable.

For all of the foregoing reasons, this court holds that the claims asserted by the McMahons in their California action are subject to arbitration and that the petitioners in this federal action are entitled to an order compelling the McMahons to arbitrate those claims as required by the arbitration clauses in the agreements referred to earlier in this order.

■ Having concluded that the McMahons' claims must be arbitrated, this court must now decide whether it may properly enjoin the California state court from further proceeding on the complaint filed by the McMahons there.

At the hearing conducted on July 11, 1988, counsel for the McMahons characterized this court's order staying the California action as "unprecedented." However, the McMahons have cited no Eleventh Circuit authority for the proposition that a federal court, once it compels arbitration, is without authority to enjoin state court proceedings that involve the very claims that are to be arbitrated. Indeed, the Eleventh Circuit in dicta has recognized that a federal court does have such authority. *Ultracashmere House, Ltd. v. Meyer*, 664 F.2d 1176 (11th Cir.1981). Furthermore, the Supreme Court itself in *Moses H. Cone* recognized that that issue presented an open question and specifically declined to address it. This court recognizes that, in deciding whether to stay a state court proceeding, "it must proceed with caution, tak-

ing into account general considerations of federalism and, in particular, the likelihood of seriously disrupting the legitimate functioning of the judicial system of the state." *Ultracashmere House*, 664 F.2d at 1180. This court finds that in the particular circumstances of this case, the legitimate functioning of the California judicial system would not be disrupted, since the California action proceeded no further than the initial stages of discovery and had been pending less than two months when this court issued its initial stay order. This court further finds that the policies embodied in the federal arbitration act militate against having ongoing state proceedings at the very time that those same claims are the subject of arbitration proceedings. This court does not lightly interfere with the proceedings of a state court. Nevertheless, this court concludes that the principle of judicial economy, the strong judicial policy expressed by the Supreme Court favoring arbitration, and the policies embodied in the federal arbitration act warrant, and even require, a stay of the California action.

In summary, the petitioner's motion to compel arbitration is GRANTED, and all proceedings in the case of *McMahon v. Williams*, No. 888020, Superior Court of the State of California, City and County of San Francisco, are hereby STAYED.